# UNITED STATES DISTRICT COURT

O

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK WILLIG, ET AL. | ) | CASE NO. SA CV 11-399 DOC |
| | ) | (RNBx) |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | **O R D E R** DENYING |
| | ) | **DEFENDANT'S MOTION FOR** |
| EXIQON, INC. | ) | **SUMMARY JUDGMENT, OR IN** |
| | ) | **THE ALTERNATIVE PARTIAL** |
| Defendant(s). | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Before the Court is a Motion for Summary Judgment, or in the alternative, Partial Summary Judgment. (Dkt. 18.) After considering the moving, opposing and replying papers thereon, and for the reasons stated below, the Court hereby DENIES the Motion.

## I.    BACKGROUND

Plaintiffs Mark Willig ("Willig") and Cynthia French ("French") filed this case against Exiqon, Inc. ("Defendant") in the Orange County Superior Court, alleging claims for: (1) breach of severance agreement, (2) violation of California Labor Code § 201, and (3) penalties under California Labor Code § 203. On March 11, 2011, Defendant removed the case to federal court based on diversity jurisdiction.

### A.    Exiqon Companies

Defendant Exiqon, Inc. is a wholly-owned subsidiary of the Danish company Exiqon A/S.  Exiqon, Inc. was created as part of Exiqon A/S's "process of establishing a sales force in the United States."  (Johnson Decl., Ex. 4 at 31.)  Accordingn to Exiqon, Inc.'s President, Lars Kongsbak ("Kongsbak"), Exiqon, Inc.'s ambition to establish a sales force in the United States failed because they ran out of money.  (Johnson Decl., Ex. 4 at 31, Kongsbak Depo. Tr. at 21:6-11.)  Kongsbak is also the President/CEO and Managing Director of Exiqon A/S and was the President of Oncotech before it went out of business.  (Kongsbak Decl. ¶ 1.)  Exiqon, Inc. is the only named Defendant in this case.

Exiqon A/S, Exiqon, Inc.'s parent company, "is a biotechnology business whose core business is to develop, manufacture and market products for molecular biology analysis."  (French Decl., Ex. 15 at 21.)  Exiqon A/S "market[s] [its] products and services for nucleic acid analyses worldwide directly from [its] headquarters in Denmark and [its] sales organization in the United States . . . ."  (*Id.* at 22.)  Exiqon A/S's customers include "molecular biologists in the pharmaceutical, diagnostic and agrotechnology industries, and academic institutions in the field of molecular biology. (*Id.*)  These customers perform research into diseases such as cancer and metabolic disease, among other things.  (*Id.*)  Exiqon A/S's products measure "very precise and sensitive" changes in gene activity and can be used to analyze mRNA and miRNA.  (*Id.*)

On January 28, 2008, Exiqon A/S announced that it would acquire Oncotech, Inc.

("Oncotech") (which later operated as Exiqon Diagnostics, Inc.) as a wholly-owned

subsidiary.  (*Id.* at 21.)  Oncotech sold an extreme drug resistance ("EDR") cell-based

test used to identify tumors and how resistant they are toward different types of

chemotherapy.  (Johnson Decl., Ex. 4 at 32.)  Oncotech went out of business in 2010.

### B.      Plaintiff Willig's Employment

Willig alleges that he entered into an employment agreement with both Exiqon,

Inc. and Oncotech,[1] as set forth in a letter dated October 28, 2009.  (Compl. ¶ 6.)  On

December 2, 2009, the agreement was amended to include a Severance and Retention

Pay provision.  (*Id.* ¶ 7.)  On February 2, 2010, the agreement was again amended

through modification to the severance provision.  (*Id.* ¶ 8.)  On June 4, 2010, Willig was

laid off, not terminated for cause, but no severance was paid.  (*Id.* ¶¶ 22-24.)

Willig's employment agreement indicates that he was hired as "Chief Commercial

Officer with Oncotech, Inc."  (Chang Decl., Ex. 2 at 33.)  The duties of this position

include, "(i) management of the sales and marketing teams at Oncotech, Exiqon A/S and

Exiqon Inc. within the company's current two financial segments, (ii) development and

implementation of Exiqon's strategy for how to market and sell Exiqon Life Sciences'

research products and Exiqon diagnostics (Oncotech's) diagnostic products . . . ."  (*Id.*)

The offer letter also states that Willig's salary would be reviewed annually by "the

---

[1]  Oncotech went out of business on or around June 4, 2010 when it executed an
Assignment for the Benefit of Creditors, effective June 12, 2010.  (Kongsbak Decl. ¶ 6.)
Plaintiffs were apparently unable to recover any of the severance pay they sought in
Oncotech's winding up.

Company," which was defined in the agreement to mean Oncotech.[2]   Under the

agreement, Willig was eligible to participate in "the Company's annual incentive

program" which has its terms and conditions set "purely at the discretion of Exiqon A/S'

board of Directors."  (*Id.*)  It also discusses participation in an equity award program

which awards Exiqon A/S stock purely at the Board's discretion.  (*Id.* at 34.)  The letter is

signed by Kongsback as "CEO of Exiqon A/S."  (*Id.* at 35.)

Willig's employment agreement was amended as of December 7, 2008 to include

a new provision regarding severance pay.  (Chang Decl., Ex. 3 at 36.)  Under the

amendment, the Company (again defined as Oncotech) agreed to pay twelve months of

severance pay if Willig was terminated without cause.  Cause was defined as conduct

conflicting with the business interests of Oncotech or Exiqon A/S, or unethical, dishonest

or illegal activity materially adverse to Oncotech or Exiqon A/S, among other similar

examples.  (*Id.*)  Significantly, repeated violation of Oncotech or Exiqon A/S policies or

procedures and failure to comply with directions given by the Board of Directors or CEO

of Exiqon A/S also constituted "cause."  (*Id.* at 37.)  The amendment concluded by

stating, "this amendment, together with the offer letter of 28 October 2009 will constitute

the complete agreement between you and the Company regarding employment matters

reference [sic] herein."  (*Id.*)

As of December 30, 2009, the severance provision was replaced with a new

severance provision.  (Chang Decl., Ex. 4 at 38.)  The terms were similar to the first

---

[2]  It is undisputed that Willig's salary was reviewed by a compensation committee of
Exiqon A/S board members.  (UF #23.)

severance provision, but they recognized that Willig might participate in a buyout of the Oncotech assets, which may conflict with Exiqon A/S's business interests, but would not constitute "cause" for termination.  (*Id.* at 39.)  Willig was paid a retention bonus of three months' salary and his future severance was limited to nine months' salary.

### C.    Plaintiff French's Employment

French alleges that she entered into an employment agreement with both Defendant and Oncotech, as set forth in a letter dated May 25, 2008.  (Compl. ¶ 9.)  On February 4, 2010, the agreement was amended to include a Severance and Retention Pay provision.  (*Id.* ¶ 10.)  On March 12, 2010, the agreement was again amended through modification to the severance provision.  (*Id.* ¶ 11.)  On June 4, 2010, French was laid off, not terminated for cause, but no severance was paid.  (*Id.* ¶¶ 29-31.)

French's employment agreement indicates that she was hired as "Chief Sceintific Officer with Oncotech, Inc. ("the Company")."  (Chang Decl., Ex. 11 at 79.)  French's job responsibilities included "management of the product development teams at Oncotech and Exiqon, development and implementation of Exiqon's product development strategy [to] provide input to clinical trial design and strategies, and secur[ing] compliance to ISO 9001 at Exiqon and CLIA lab regulations at Oncotech," among others.  (*Id.*)

French's employment agreement contained identical language to Willig's agreement regarding Exiqon A/S's incentive program and Exiqon A/S's discretion to allow continued participation.  (*Id.* at 80.)  French's agreement also contained the same integration clause.  (*Id.* at 81.)

5

Like Willig, French's employment agreement was amended to include the first severance provision, as of January 1, 2009.  (Chang Decl., Ex. 12 at 82.)  The amendment contains the same examples as Willig's regarding termination for "cause," as determined by Oncotech or Exiqon A/S.  (*Id.* at 83.)  Just like Willig, French's severance provision was again amended, as of March 12, 2010, to provide a retention bonus of three months' pay and severance pay in the amount of nine months' salary if she was terminated without cause.  (Chang Decl. Ex. 13 at 84.)

### D.   Joint Employment Theory

Plaintiffs' key allegation is that they were employed by *both* Exiqon, Inc. (i.e., the entity they believe is Exiqon A/S operating in the United States) and Oncotech because both employers exercised control over and directed the work of Plaintiffs.  (*Id.* ¶ 14.) Because neither Plaintiff was terminated for cause, they contend they should have been paid severance by Exiqon in accordance with their respective employment agreements. They also allege that Labor Code § 201 was violated because all wages were not paid immediately upon termination (i.e., severance pay constitutes a type of wages) (*id.* ¶¶ 34-36), and they are owed penalties under Labor Code § 203 because all wages were not paid within thirty days (*id.* ¶¶ 44-46).

## II.   LEGAL STANDARD

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Summary judgment may be granted where no "reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are those which, under applicable substantive law, may affect the outcome of the case.  *Id.*  In determining whether a genuine issue of material fact exists, the evidence must be construed in the light most favorable to the non-moving party. *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009).  The Court must not weigh disputed evidence with respect to a disputed material fact, nor should it make credibility determinations regarding statements made in affidavits, answers to interrogatories, admissions, and/or depositions.  *Id.*  Those determinations are left for the jury.  *Id.*

On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof at trial, the moving party need only "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  Once the summary judgment proponent has discharged its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by [other evidence], designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting then-current Fed. R. Civ. P. 56(e)).

## III.    DISCUSSION

### A.    Evidentiary Objections

Each party filed evidentiary objections to various evidence submitted by the opposing party.  As an initial matter, the Court rules on the objections as follows.

**<u>Plaintiffs' Objections</u>**

| Objection to the Decl. of Lars Kongsbak | |
|---|---|
| **Testimony and Nature of Objection** | **Ruling** |
| Plaintiffs object to ¶¶ 3-8 on the grounds that the statements are inadmissible hearsay, lack foundation, and/or contain a legal conclusion. | ¶ 3 speaks to Exiqon, Inc.'s corporate status and business.  The objection is overruled on all grounds.  It is not a legal conclusion and Kongsbak is competent to testify as the CEO.

¶ 4 speaks to Exiqon, Inc.'s status as a subsidiary.  The objections are overruled for the same reasons as to ¶ 3.

¶ 5 discussing the acquisition of Oncotech.  The objection is overruled because this statement is not hearsay.

¶ 6 discussing Plaintiffs' termination from Oncotech.  The objections are overruled for the same reasons as to ¶ 3.

¶ 7 discussing who approved Plaintiffs' wages.  The objections are overruled for the same reasons as to ¶ 3.

¶ 8 discussing an email sent to French.  The objections are overruled for the same reasons as to ¶ 3. |

**Defendant's Objections**

| Objection to the Decl. of Jill Johnson | |
|---|---|
| **Testimony and Nature of Objection** | **Ruling** |
| Ex. 7 "Building a World Leading Company" PowerPoint presentation. Defendant objects on the basis that this document has not been authenticated. Fed. R. Evid. 901(a). | The objection is overruled. The bates stamps show this document was part of Plaintiff's document production and even if the Johnson Declaration does not authenticate this document, evidence that can be properly authenticated at trial may still be admitted on summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). |

| Objection to the Decl. of Mark Willig | |
|---|---|
| **Testimony and Nature of Objection** | **Ruling** |
| ¶ 3 regarding job responsibilities. Defendant objects that this statement is hearsay. | The objection is sustained. Even if the Court considered the statement, self-serving affidavits are insufficient to overcome summary judgment. |
| ¶ 4 regarding employment responsibilities at all three facilities. Defendant objects that this statement is hearsay and inadmissible parol evidence. | The objection is sustained as hearsay. The Court discusses parol evidence separately. |
| ¶ 7 regarding who Willig supervised. Defendant objects that this statement lacks foundation and is conclusory. | The objection is overruled. Willig may testify regarding who he supervised when he was hired. |
| ¶ 8 regarding using "Exiqon" interchangeably. Defendant objects that this statement lacks foundation. | The objection is overruled. The cited documents come from Plaintiffs' document production and pertain to the structure of the company for which Willig worked. Willig may testify as to his understanding of the organization. |

| Objection to the Decl. of Cynthia French | |
|---|---|
| **Testimony and Nature of Objection** | **Ruling** |
| ¶ 14 regarding referring to the company as "one company." Defendant objects that this statement lacks foundation and is immaterial. | The objection is overruled. French may testify as to her understanding of the organization from her perspective as an employee. |
| ¶ 15 "Status Update" regarding plans for Tustin. Defendant objects that this statement lacks authentication and | The objection is overruled because French is the co-author of the document. Moreover, evidence that can be properly authenticated at trial may still |

| | |
|---|---|
| foundation. | be admitted on summary judgment. *Fraser*, 342 F.3d at 1036. |
| ¶ 17 regarding Oncotech Prospectus. Defendant objects that French's statement lacks authentication and foundation. | The objection is overruled.  French was hired in conjunction with the transaction described in the Prospectus.  She may discuss her understanding of the business. |
| ¶ 21 regarding how Oncotech was funded. Defendant objects that this statement lacks personal knowledge and foundation. | The objection is sustained.  French bases her statement on reading emails, not on her own personal knowledge. |
| ¶ 22 regarding comingling of funds. Defendant objects that this statement lacks personal knowledge and foundation. | The objection is sustained.  French bases her statement on reading emails, not on her own personal knowledge. |

| | |
|---|---|
| **Objection to the Decl. of Doug Harrington** | |
| **Testimony and Nature of Objection** | **Ruling** |
| ¶ 4 regarding who was on the Board(s) of Directors.  Defendant objects that this statement lacks foundation. | The objection is overruled.  Dr. Harrington's foundation is based on his averment that he was also on the Board(s) of Directors. |
| ¶ 5 regarding a single Board of Directors for all three companies.  Defendant objects that this statement lacks foundation and personal knowledge.  Defendant argues that the statement is contradicted by corporate records | The objection is overruled for the same reason as ¶ 4, especially in light of the absence of citation to specific conflicting records. To the extent Defendant relies on the print out from the Secretary of State's website, this record is insufficient to support Defendant's position for the reasons discussed *infra*. |
| ¶ 6 regarding comingling of funds. Defendant objects that this statement lacks personal knowledge and foundation, and is based on speculation or conjecture. | The objection is overruled.  Dr. Harrington states that he was the lab director for Oncotech, and the example he gives regarding financial statements pertains to revenue for lab and research sales. Presumably the lab director is aware of the lab's total revenues. |
| ¶ 7 regarding Oncotech's undercapitalization.  Defendant objects that this statement lacks personal knowledge and foundation, and asserts a legal conclusion. | The objection is sustained.  Dr. Harrington provides no foundation for this statement and may not provide a legal conclusion. |
| ¶ 8 regarding Plaintiffs' business unit | The objection is sustained.  Dr. Harrington does |

| responsibilities.  Defendant objects that this statement lacks personal knowledge and foundation. | not provide any foundation regarding how he is competent to testify as to Plaintiffs' job responsibilities by virtue of being on the Board(s). |
|---|---|

### B.    Contract Interpretation and Extrinsic Evidence

### 1.    Legal Standard

A contract must be construed as a whole, with the individual provisions interpreted together so as to give effect to all provisions, if reasonably possible or practicable.  Cal. Civ. Code, § 1641; Cal. Code Civ. Proc. § 1858.  The goal of contract interpretation is to give effect to the mutual intention of the parties. Cal. Civ. Code § 1636.  "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties."  *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473–74 (1998) (citing Cal. Civ. Code, §§ 1635–1656; Cal. Code Civ. Proc. §§ 1859–1861, 1864). Where possible, the parties' mutual intent should be inferred from the writing alone. *Brinton v. Bankers Pension Servs., Inc.*, 76 Cal. App. 4th 550, 559 (1999).

The parol evidence rule prohibits use of extrinsic evidence to contradict or supplement a contract where the contract "is intended to be a final expression of that agreement and a complete and exclusive statement of the terms."  *Lonely Maiden*

*Productions, LLC v. Goldentree Asset Mgmt., LP*, B225782, --- Cal. Rptr. 3d ----, 2011

WL 5966335, at *3, (Cal. App. Nov. 30, 2011).  If the contract purports to be a complete

and final expression of the agreement on its face, then extrinsic evidence is excluded.  *Id.*

However, "extrinsic evidence is admissible to explain or interpret ambiguous language."

*Id.* (citing Cal. Code Civ. Proc. § 1856(b), (g)).

When a dispute arises as to the meaning of contractual language, the Court

receives provisionally extrinsic evidence to determine whether it in fact reveals an

ambiguity.  *Id.*  An ambiguity exists if "the language is reasonably susceptible to more

than one possible meaning."  *Id.*  If an ambiguity is present, extrinsic evidence should be

admitted to aid in interpretation of the contract.  *Id.  See also Winet v. Price*, 4 Cal. App.

4th 1159, 1165 (1992) ("The decision whether to admit parol evidence involves a two-

step process. First, the court provisionally receives (without actually admitting) all

credible evidence concerning the parties' intentions to determine ambiguity, i.e., whether

the language is reasonably susceptible to the interpretation urged by a party. If in light of

the extrinsic evidence the court decides the language is reasonably susceptible to the

interpretation urged, the extrinsic evidence is then admitted to aid in the second step—

interpreting the contract.") (internal quotation marks omitted).

"Even if a contract appears unambiguous on its face, a latent ambiguity may be

exposed by extrinsic evidence which reveals more than one possible meaning to which

the language of the contract is yet reasonably susceptible."  *Morey v. Vannucci*, 64 Cal.

App. 4th 904, 912 (1998).  "The test of admissibility of extrinsic evidence to explain the

meaning of a written instrument is not whether it appears to the court to be plain and

unambiguous on its face, but whether the offered evidence is relevant to prove a meaning

to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec.*

*Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968).

If there is no "material conflict" in the extrinsic evidence, the contract should be

interpreted by the Court as a matter of law. *Lonely Maiden*, 2011 WL 5966335, at *3.

On the other hand, when "ascertaining the intent of the parties at the time the contract

was executed depends on the credibility of extrinsic evidence, that credibility

determination and the interpretation of the contract are questions of fact that may

properly be resolved by the jury." *City of Hope Nat. Medical Center v. Genentech, Inc.*,

43 Cal. 4th 375, 395 (2008).

### 2.    Discussion

### a.    Complete Agreements

As an initial matter, the Court notes that the contracts are the employment

agreement, as amended to contain an updated severance provision.  Each agreement

consists of the signed offer letter and the two amendments regarding severance (with the

second replacing the terms of the first).  This is clear from the language of the documents.

The signed offer letters state that "The nature of your employment as set forth in this

offer letter cannot be modified in any way except by written agreement signed by you

and an officer of the Company."  (Chang Decl., Ex. 2 at 35 (Willig); Ex. 11 at 81

(French).)  Once signed, the offer letter "constitute[d] the complete agreement between [Plaintiffs] and the Company regarding employment matters referenced herein."  (*Id.*).

The first amendment noted that "It has now been agreed to amend . . . the terms and conditions that was [sic] set forth in the offer letter . . . Once signed by you, this amendment together with the offer letter . . . will constitute the complete agreement between you and the Company regarding employment matters referenced herein."  (*Id.*, Ex. 3 at 36-37; Ex. 11 at 82-83.)  The second amendment noted that "It has now been agreed to amend . . . the terms and conditions that were set forth in these letters [the offer letter and first amendment]  . . . Once signed by you this amendment, together with the offer letter . . .  and [the first amendment] will constitute the complete agreements between you and the Company regarding employment matters referenced herein."  (*Id.*, Ex. 4 at 38. 41; Ex. 13 at 84, 86 (similar).)

Based on the foregoing language, the Court concludes that each contract consists of three documents (offer letter plus two severance amendments) and each contract is fully integrated.  Accordingly, parol evidence may not be introduced to supplement or contradict the terms of the contracts.  *Lonely Maiden*, 2011 WL 5966335 at *3. However, this does not answer the question of whether it may be introduced to aid in interpretation.

### b.    Ambiguity

Plaintiffs contend there is a dispute regarding the meaning of contractual language. Specifically, they find ambiguity in the language explaining which entity or entities had

control over Plaintiffs' employment.  (Opp'n at 15.)  The Court thus receives

provisionally extrinsic evidence to determine whether it in fact reveals an ambiguity.

*Lonely Maiden*, 2011 WL 5966335 at *3.  If the language is reasonably susceptible to

more than one meaning, the Court may admit the extrinsic evidence to aid in

interpretation of the contracts.  *Id.*

       Turning first to the contractual language, the Court notes tension between the

offers of employment with "Onotech, Inc. (the "Company")" and the substantive terms of

the offer with respect to "Exiqon."  First, Willig, as Chief Commercial Officer, was

expected to manage the sales and marketing teams at "Oncotech, Exiqon A/S and Exiqon,

Inc. within the company's current two financial segments."  (Chang Decl., Ex. 2 at 33.)

He was also expected to develop and implement "Exiqon's strategy for how to market

and sell Exiqon Life Sciences research products and Exiqon diagnostic's (Oncotech's)

diagnostic products."  (*Id.*)  Similarly, French, as Chief Scientific Officer, was expected

to manage the product development teams "at Oncotech and Exiqon," as well as develop

and implement "Exiqon's product development strategy."  (*Id.*, Ex. 11 at 79.)  The

Exiqon A/S Board of Directors had discretion over whether Willig and French could

continue to participate in the "company's equity award plan."  (*Id.* at 80; Ex. 2 at 34.)

Both of the initial employment offers were signed by Kongsbak as "CEO of Exiqon

A/S."  (*Id.* at 81; Ex. 2 at 35.)

       With respect to the amendments, *either* Oncotech or Exiqon A/S had discretion to

determine if there was "cause" for termination and cause was generally defined as actions

adverse to or in violation of the policies of Onocotech or Exiqon A/S.  (*See, e.g.*, *id.*, Ex. 3 at 36; Ex. 4 at 39.)   The amendments were also signed by Kongsbak as "CEO of Exiqon A/S."  Willig's second amendment has the header "Exiqon A/S" at the top.

Second, provisionally considering the extrinsic evidence, the Court notes that on June 7, 2008, Kongsbak sent an email to French stating that she would "hold the position of CSO of Oncotech and Exiqon and [she] will have the responsibility for the entire product development throughout the organization."  (Kongsbak Decl. ¶ 8, Ex. 1.)  The email went on to explain that French was "employed by Oncotech but that is for legal reasons."  (*Id.*)

Exiqon A/S held Willig out to the public as being a part of Exiqon.  Specifically, on September 11, 2009, Exiqon A/S "announced the appointment of Mark R. Willig as new Chief Commercial Officer.  Mark Willig joins Exiqon from Thermo Fisher Scientific, Inc. . . . ."  (Willig Decl., Ex. 26 at 10.)  The announcement goes on to say that Willig "will be responsible for managing sales & marketing of all products and services in both of Exiqon's two financial segments: Exiqon Diagnostics and Exiqon Life Sciences."  (*Id.*)

Similarly, Exiqon A/S held French out as being a part of Exiqon.  Exiqon issued a press release regarding French's employment.  The press release was titled "Exiqon Appoints Cynthia French as Chief Scientific Officer . . . ."  (French Decl., Ex. 17 at 25.)  The release, dated June 30, 2008, stated that "Cynthia K. French joins Exiqon from Affymetrix where she served as Vice President . . . ."  (*Id.*)  It later states that French

16

"will be based at Oncotech Inc., in Tustin, California, a wholly owned subsidiary of Exiqon A/S." (*Id.* at 26.)

French and Willig were also listed on Exiqon's website as part of the "Executive Management" team. (French Decl., Ex. 18 at 42). Both are referred to as having joined Exiqon. (*Id.*)

Willig and French both testified that based on the foregoing, they thought Exiqon was one company and receiving paychecks from Oncotech was a mere formality. Willig's understanding was that he was an Oncotech employee "for legal reasons" because of his work location, but it didn't reflect his "true title or responsibilities." (Chang Decl., Ex. 1 at 13, Willig Depo. 97:14-22.) Willig believed his severance would be paid by Exiqon A/S and sought to clarify the severance agreement listing Oncotech as the responsible party. (*Id.* at 14, Willig Depo. 104:18-25, 105:1-3.) However, when Willig received the second amendment to the severance provision, rather than pressing Kongsbak to sign a document, proposed by Willig, clarifying that Exiqon A/S was responsible for severance, Willig signed the amendment.[3] (*Id.* at 25-26.)

_____

[3] More specifically, Willig recognized that his employment agreement as amended may be interpreted as resulting in no severance pay to him if Oncotech became unable or unwilling to pay. In response, he asked Exiqon to guarantee performance by Oncotech in paying severance, in that if Oncotech failed to pay, Exiqon agreed to pay. (Chang Decl., Ex. 5 at 43.) Kongsbak never countersigned this proposed amendment. (*Id.* at 44.) At oral argument, Defendant argued that Willig's acknowledgement shows there is no issue of fact regarding the meaning of the employment agreement. The fact that Willig sought to clarify the terms of his employment agreement, especially in light of representations by Kongsbak that severance would be paid in the event of a "windup," as pointed out by Plaintiffs, demonstrates a disputed issue of fact which the Court may not resolve on summary judgment. (*See* Willig Decl., Ex. 29 at 19.)

Similarly, French believed she was paid through Oncotech because of the location, but understood that she was the Chief Sceintific Officer of Exiqon.  (Chang Decl. Ex. 10 at 63.)  She assumed Exiqon was responsible for her severance pay because it was "all one company."  (*Id.* at 63, 65.)  French testified that "[w]e all assumed that from the – certainly what Lars had said to me is that the Oncotech designation was, again, something that did not preclude us from being – having any of our employment agreements not honored by the corporate group in Denmark, since we had our responsibilities aligned with that as the overall company structure."  (*Id.* at 75.)

Taken together, the foregoing extrinsic evidence suggests an ambiguity in the employment contracts.  The documents themselves are unclear as to the nature of Plaintiffs' seemingly dual roles for Oncotech and "Exiqon."  Oncotech may be defied as "the Company" in the agreements, but Plaintiffs' responsibilities to Exiqon A/S (or just "Exiqon" generally) are mentioned throughout, and the contracts were signed by the CEO of Exiqon A/S, raising the question of Exiqon A/S's rights and responsibilities under the agreements.[4]  The extrinsic evidence brings this ambiguity into sharp focus.  Both Willig and French were publicly held out as being part of Exiqon A/S, in press releases and on the company's website, and communications from Kongsbak suggested that being designated an Oncotech employee was a mere formality, with Exiqon A/S the company

---

[4] At oral argument Defendant questioned whether Exiqon, Inc. is properly implicated in this analysis.  A review of the evidence demonstrates that the employment agreements, website, and press releases, among others, use the term "Exiqon" loosely; it is not clear whether these reference mean Exiqon, A/S, Exiqon, Inc., or both.  In addition, as previously mentioned, Willig's employment agreement specifically mentions the responsibility of managing Exiqon, Inc.'s sales and marketing teams.

for whom Plaintiffs worked.  In addition, the evidence raises questions regarding the distinctness of the three corporate entities: Exiqon A/S , Exiqon, Inc., and Oncotech. These questions are further explored in the alter ego analysis below.

Because the Court finds the employment agreements susceptible to the meaning urged by Plaintiffs, that they worked for both Oncotech and Exiqon A/S to the extent they were distinct entities, or they essentially worked for one entity "Exiqon," to the extent the so-called entities were alter egos of one another, the extrinsic evidence is admitted to aid in interpretation of the agreements.  *See Winet*, 4 Cal. App. 4th at 1165.

### c.    Interpretation

As stated above, if there is no dispute over the extrinsic evidence, the Court may interpret the agreements as a matter of law.  *Lonely Maiden*, 2011 WL 5966335 at *3. However, if the Court cannot determine the parties' intent at the time of contracting without judging the credibility of the extrinsic evidence, the disputed factual questions go to the jury.  *City of Hope*, 43 Cal. 4th at 395.

The Court cannot determine the parties' intent without weighing the extrinsic evidence.  For example, the parties disagree over the import of Kongsbak's email to French explaining that she would be paid by Oncotech but that she was CSO of both Exiqon and Oncotech.  Defendant argues that the email shows French was solely employed by Oncotech while French argues that the email shows a dual employment arrangement, or at least working for two parts of the same overall Exiqon company. Likewise, Willig's correspondence with Kongsbak points out that they discussed "the

spirit of the agreement," which Willig believes was to protect him. (Chang Decl., Ex. 6 at 45.) However, the Court cannot determine the "spirit of the agreement," i.e., the parties' intent as manifested in the employment agreement, without weighing conflicting evidence and testimony. Moreover, the dispute over whether Plaintiffs worked for one or more entities cannot be resolved without turning to the question of whether Defendant Exiqon, Inc. may be treated as the alter ego of Exiqon A/S and/or Oncotech.

### C. Alter Ego

#### 1. Legal Standard

A corporate entity may be disregarded where it is organized and controlled "to make it merely an instrument, agent, conduit, or adjunct of another corporation." Cal. Jur. Corporations § 28 (citing *McLaughlin v. L. Bloom Sons Co.*, 206 Cal. App. 2d 848 (1962)). A parent corporation may be the alter ego of a subsidiary corporation, and under the single enterprise doctrine, a sister corporation may be the alter ego of another corporation. *Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220 (1991).

Before the alter ego or single enterprise doctrines may be applied to two corporations, the party seeking to disregard the corporate entity must show: (1) unity of interest such that separate corporate personalities no longer exist, or have been merged, "so that one corporation is a mere adjunct of the other or the two companies form a single enterprise;" and (2) inequitable results will follow if the corporations are separately recognized. Cal. Jur. Corporations § 28 (citing *Brooklyn Navy Yard Cogeneration*

*Partners, L.P. v. Superior Court (Parsons Corp.)*, 60 Cal. App. 4th 248 (1997); *Tran v. Farmers Group, Inc.*, 104 Cal. App. 4th 1202 (2002), as modified on denial of reh'g, (Jan. 27, 2003) and review denied, (Mar. 26, 2003)).

To determine unity of interest, courts examine various factors, including: "inadequate capitalization, disregard of corporate formalities (such as stock issuance, keeping of minutes, election of officers and directors, segregation of corporate records), identical directors and officers, commingling of funds and other assets, identical equitable ownership in the two entities, the holding out by one entity that it is liable for the debts of the other, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Id.* (citing *Brooklyn Navy Yard*, 60 Cal. App. 4th at 248; *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523 (2000)). No single factor controls and courts should evaluate all the circumstances. *Shaoxing County Huayue Import & Export v. Bhaumik*, 191 Cal. App. 4th 1189, 1198 (2011).

## 2.    Discussion

Plaintiffs argue that whether Exiqon A/S, Exiqon, Inc., and Oncotech were each alter egos of the other entities is a disputed fact.  (Opp'n at 16.)  Plaintiffs support this argument by stating that Exiqon A/S frequently gave money to Oncotech so Oncotech could cover bills, including payroll, when Oncotech had insufficient funds.  (*Id.* at 18.) They also point out that each Plaintiff was held out as a director or officer of Exiqon A/S in press releases and on the Exiqon website.  (*Id.*)  French argues that she was responsible for supervising employees at both Exiqon A/S and Exiqon, Inc., splitting her time

21

between all three locations.  (*Id.*)  Plaintiffs further contend that Oncotech was undercapitalized, there was no separate board of directors for Exiqon, Inc. and Oncotech, and the employment agreements were structured in an attempt to avoid liability for severance by using Oncotech as a shield.  (*Id.* at 19.)

Defendant argues that money transferred from Exiqon A/S to Oncotech was done so pursuant to formal loans from Exiqon A/S, and where possible, Oncotech employees were generally paid by money generated from Oncotech's sales.  (Reply at 8.; Chang Reply Decl., Ex. 1 at 10.)

The Court agrees with Plaintiffs that disputed issues of fact remain regarding alter ego.  First, Defendant's argument that the employment agreements treat Oncotech and Exiqon A/S as different entities (Reply at 6) misses the point.  Whether a parent and subsidiary hold themselves out to employees to be separate companies is not determinative of whether they acted as distinct entities.  Accepting this argument would overlook the various factors relevant to the analysis.

However, most of the evidence cited by Plaintiffs to show that Exiqon A/S gave money to Oncotech does not support applying the alter ego doctrine.[5]  A parent assisting a subsidiary with its financial obligations and not for the purpose of committing fraud is insufficient to create liability.  *Sonora Diamond*, 83 Cal. App. 4th at 539.  See also *Hill v.*

---

[5] The Court also questions whether French is in a position to testify about financial matters.  At her deposition she admitted she lacked "financial or organizational visibility into the company."  (Johnson Decl., Ex. 2 at 22.)  However, with people reporting to her from all three locations, and no transaction prices recorded for sending equipment between the divisions, as she had done in other subsidiary roles in previous jobs, she noted her belief that it was all "one structure."  (*Id.* at 23.)

*State Farm Mut. Auto. Ins. Co.*, 166 Cal. App. 4th 1438, 1494-95 (2008) (A parent acting as an investor in a subsidiary by monitoring performance, supervising budget decisions, and setting forth general policies and procedures acts pursuant to the normal parent-subsidiary relationship.)  Moreover, none of this evidence speaks to whether Defendant Exiqon, Inc. co-mingled funds with either Exiqon A/S or Oncotech.  The cited evidence speaks to the relationship between Exiqon A/S and Oncotech.

One piece of evidence, however, does suggest that Exiqon, Inc. and Oncotech were treated as one company for financial record keeping purposes.  Dr. Doug Harrington, former lab director for Oncotech, who states he was also on the Board of Directors, submits that revenue from lab sales in the U.S. (i.e., revenue from both Oncotech and Exiqon, Inc.) was consolidated into a single financial schedule so the reader could not tell how an individual unit was performing.  (Harrington Decl. ¶ 6.) Defendant argues that Harrington's assertion  lacks foundation, but the Court fails to see why the lab director at Oncotech would not be familiar with the financial schedule reporting on lab sales revenue.  While this testimony does not speak to comingled funds, if found credible by a jury, it may suggest use of internal procedures contrary to the corporate form urged by Defendant.

Plaintiffs also raise a genuine issue of fact with respect to whether all three entities were essentially one in the same company, as demonstrated in part by Plaintiffs' connection with both Exiqon A/S and Exiqon, Inc.  As previously stated, Plaintiffs were held out as members of Exiqon A/S's executive team via the press releases and the

website, French was responsible for supervising employees at all three locations and split her time between these locations. (French Decl. ¶ 27.)  Willig was hired to manage the sales and marketing teams at Oncotech, Exiqon A/S, and Exiqon, Inc. (Chang Decl., Ex. 2 at 33.)  Employees of one corporation working for another corporation but not being compensated by the second corporation tends to support a conclusion that one corporation is the alter ego of the other.  *Marr v. Postal Union Life Ins. Co.*, 40 Cal. App. 2d 673 (1940).

Other evidence raises a dispute over how the entities were operating and whether corporate formalities should be observed.  Specifically, there is a question over whether the U.S.-based entities were conduits for Exiqon A/S, with all three essentially being one organization.  For example, Exiqon A/S's diagnostic products would be sold "through [its] own sales force in the US and through distributors throught the rest of the world." (Johnson Decl., Ex 5 at 339.)  Part of Exiqon's plan was to "Leverage the synergies between the different businesses and create one company: Exiqon."  (*Id.*)  Sample organization charts also show one corporate structure.  (Johnson Decl., Ex.7 at 63.) While this evidence in not determinative of the fact that Exiqon A/S used Exiqon, Inc. and Oncotech as mere conduits for its own business in the U.S., it raises factual issues regarding whether the three entities were distinct or merely different branches of a unitary organization.

There is further dispute over the nature of the Board(s) of Directors, which may also support application of the alter ego and/or single enterprise doctrines.  First,

Kongsbak's declaration states that he is the only director of Exiqon, Inc. and the membership of the Exiqon, Inc. Board of Directors has not changed since 2008. (Kongsbak Reply Decl. ¶¶ 3-4.)  Kongsbak states there are three other officers: treasurer, secretary, and assistant secretary.  (*Id.* ¶ 3.)  Current records submitted from the Secretary of the Commonwealth of Massachusetts do not match this statement in that they do not list an assistant secretary.  (Chang Reply Decl., Ex. 4 at 28-29.)  Moreover, it is unclear whether being listed as a "Director" on this website is synonymous with being a member of the Board of Directors and whether the Secretary's website may be deemed to represent the entire composition of the Board.  In any event, no similar record from the relevant time period is provided.

In addition, Plaintiffs submit the sworn declaration of Dr. Doug Harrington wherein he states that he was a member of the Board of Directors for all three entities, which was really operated as a single Board of Directors composed of one set of members for all entities.  (Harrington Decl. ¶¶ 2, 4-5.)  Defendant intimates that Harrington cannot be trusted because he is a "personal friend and current colleague" of French (Reply at 11), and that his testimony is refuted by the Secretary of State's website. However, as the Court already noted, the website is from November 2011, not the relevant time period.  Harrington states that he left the Board of Directors in 2010.  (*Id.* ¶ 3.)  Whether Harrington is correct or whether Kongsbak is correct is a factual issue turning on individual credibility, a determination the Court may not make in resolving this motion.

25

The foregoing discussion demonstrates issues of fact with respect to unity of interest.  As to the second factor of the alter ego analysis, Defendant does not appear to dispute that if the corporate formalities are honored, i.e., Oncotech is treated as distinct from Exiqon A/S and Exiqon, Inc., that injustice will result because Plaintiffs cannot recover severance pay from now-defunct Oncotech.

Defendant attempts to avoid the analysis altogether by pointing out that there is no "conflicting language" regarding which entity agreed to pay severance (Reply at 6). However, if the agreements are construed to honor the corporate form, holding only Oncotech liable for severance, this highlights the fact that an injustice would result.

### D.    Breach of Contract

Defendant's motion argues that it cannot be liable for severance as a matter of law because it was not a party to the employment contracts.  (Mot. at 5-6.)  Defendant also takes issue with Plaintiffs' assertion that Exiqon A/S, not Exiqon, Inc., promised to pay their severance.

The ambiguity and alter ego discussions above foreclose granting the motion on these grounds.  Even if a jury finds that Exiqon A/S was bound to pay Plaintiffs' severance, a jury may also find that all three entities were one in the same, rendering Defendant's distinction meaningless.

The California Court of Appeal has explained the situation this way.  "An alter ego defendant has no separate primary liability to the plaintiff. Rather, plaintiff's claim against the alter ego defendant is identical with that claimed by plaintiff against the

already-named defendant. [¶] A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance, but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." *Hennessey's Tavern, Inc. v. Am. Air Filter Co.*, 204 Cal. App. 3d 1351, 1358–59 (1988).

The points raised in the ambiguity and alter ego discussions also speak to Plaintiffs' joint employment argument.[6]

### E.     Labor Code Violation: § 201

Defendant argues because it was never Plaintiffs' employer, it cannot be liable for violation of the Labor Code.  As with the breach of contract claim, the ambiguity and alter ego discussions above foreclose granting the motion on this ground.

### F.     Labor Code Penalties: § 203

Defendant argues that even if it is liable for severance, severance does not constitute "wages" and is this not an eligible basis on which to add penalties.  (Mot. at 17-18.)

---

[6] The Court declines to address Plaintiffs' improper request to add Exiqon A/S as a Defendant.  If Plaintiffs wish to add Exiqon A/S they must seek leave to amend their complaint through filing a noticed motion.  While a jury finding of alter ego as to all three entities may eliminate the need to have other named defendants, it is possible the jury may find Exiqon A/S and Oncotech to be alter egos of one another, but that Exiqon, Inc. is not an alter ego of, or single enterprise with, either.  Plaintiffs are the masters of their complaint and they must decide how best to proceed in light of the facts and evidence in this case.

Under section 203, if an employer willfully fails to pay "any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; . . . ."  Cal. Lab. Code § 203.  In section 200, wages are defined to include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."  Cal. Lab. Code § 200(a).  Labor includes "labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment."  Cal. Lab. Code § 200(b).

Plaintiffs urge the Court to follow the holding in *Triad Data Servs., Inc. v. Jackson*, 200 Cal. Rptr. 418 (1984), which found severance pay to constitute "wages." (Opp'n at 25.)  Defendant argues that *Triad* should be ignored because the court did not address the matter substantively before reaching this conclusion, and the conclusion contravenes the plain language of the Labor Code.  (Mot. at 18.)

In *Triad*, the court considered the "meaning and scope of the term 'wages.'" Without analysis, the court concluded, "Vacation pay and severance pay constitute wages."  *Triad*, 200 Cal. Rptr. at 423.  In support of this conclusion, the court cited *Ware v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 24 Cal. App. 3d 35, 44 (1972) for the proposition that "wages" includes periodic pay as well as other benefits to which the employee is entitled as part of compensation.

28

*Triad* was cited approvingly by the Ninth Circuit in *Battista v. Fed. Deposit Ins.
Corp.*, 195 F.3d 1113, 1120 n.8 (9th Cir. 1999), wherein the court noted without
discussion that "California law treats severance pay as wages."

While *Triad* and *Battista* arrive at this conclusion without any deliberation, the
Court concludes that this is the right outcome – severance pay constitutes wages under
California Labor Code § 200, and may therefore act as a basis for penalties under § 203.
The nature of severance pay suggests that it is an amount paid for labor performed under
the definition of § 200(a).  As demonstrated by the agreements in this case, eligibility for
severance pay depends on an employee satisfactorily performing labor before a
company's decision to end the employment relationship.  *See* Chang Decl, Ex. 3 at 7
(severance provided after termination without cause based on employee's then-current
salary for 12 months of work).  Whether or not the employee qualifies for severance
depends on performing job duties with due care, among other similar factors, which
necessarily looks at *past* performance of job duties.  *See id.*

This conclusion is supported by other California case law.  In *Kerin v.
Unemployment Ins. Appeals Bd.*, 87 Cal. App. 3d 146, 150 (1978), the court noted that
severance or dismissal pay has been held to wages, citing *Bradshaw v. Cal. Emp't
Stabilization Comm'n*, 46 Cal. 2d 608 (1956).  In *Takaesu v. Computer Sciences Corp.*,
No. B167707, 2005 WL 704931, at *13 (Cal. App. Mar. 29, 2005), although the court
cited *Battista*, the court explained that a severance payment falls under the definition of
"wages" because the employee was required to perform labor *before* becoming eligible

29

for the payment. *See also Castellucci v. Saks Fifth Ave., Inc.*, No. A102485, 2004 WL 1053193, at \*2 (Cal. App. May 11, 2004) (noting that the California State Labor Commissioner took the position that employer violated § 201 requiring immediate payment of wages based on employer's failure to pay severance; court found employee ineligible for severance due to terms of separation, and thus ineligible for waiting penalties under § 203, which impliedly suggests that if employee had been eligible for severance, a § 203 analysis would have been required); *Lujan v. Powerine Oil Co.*, No. B154092, 2002 WL 31112542, at \*4 (Cal. App. Sept. 24, 2002) (allowing pleading amendment to include claim for breach of contract based on failure to pay unpaid wages in the form of severance pursuant to written severance agreements).

Accordingly, the Court concludes as a matter of law that because severance pay constitutes wages under the Labor Code, failure to pay severance amounts to a violation of § 201 that may trigger penalties for nonpayment under § 203. Thus, Defendant's motion is denied on this ground. If Plaintiffs prove their § 201 claim at trial, they will be entitled to prove their section § 203 claim regarding penalties.

### G.      Request for More Time under Rule 56(d)(2)

On November 23, 2011, Plaintiffs late-filed the Declaration of Theodore E. Bacon in support of their request ofr additional time to oppose Defendant's Motion. The declaration explains a Massachusetts case in which the plaintiff alleged alter ego against the Exiqon entities as a means of having the case remanded back to state court (i.e., Exiqon Inc's Massachusetts citizenship was considered). Plaintiffs argue that select

pleadings in this case provide additional relevant evidence which the Court should consider regarding alter ego.  (Bacon Decl. ¶ 3.)  In that case, Exiqon, Inc. claimed that another employee who performed services in Massachusetts was an employee of Oncotech in California.  (*Id.* ¶ 6.)

Because the Court denies the Motion, it need not consider whether to grant Plaintiffs more time to oppose under Rule 56(d)(2), which provides relief when facts are unavailable to the nonmoving party.  Fed. R. Civ. P. 56(d)(2).  However, the Court notes that common issues with the Massachusetts case might underscore the factual disputes identified above.  For example, the Massachusetts case discusses an affidavit attesting to the near identify of Exiqon, Inc. and Exiqon A/S (*Id.*, Ex. 1 at 6 (affidavit not attached.) It also cites to purported evidence recounting activities by Exiqon, Inc. that contradicts certain statements made by Kongsbak in this case.  (*See, e.g., id.*, Ex. 1 at 9-10 (evidence not attached).)  Notwithstanding this possibility, the Court expresses no opinion on the admissibility or relevance of this unseen evidence and declines the request for more time to oppose the Motion.

## IV.   DISPOSITION

For the reasons set forth above, the Court hereby DENIES Defendant's Motion.

IT IS SO ORDERED.

DATED:  January 3, 2012

_David O. Carter_
_____
DAVID O. CARTER
United States District Judge